SEYMOUR, Circuit Judge.
Phillip Hernandez was charged under 18 U.S.C. § 922(g)(1) with one count of being a felon in possession of a firearm. He filed a motion to suppress the evidence retrieved after his encounter with two Denver police officers one evening, claiming the evidence was obtained in violation of the Fourth Amendment. The district court granted the motion. The government appeals, and we affirm.
I
On October, 20, 2014, at approximately 7:43 p.m., Denver police officers Wile Mor-ghem and Daniel Walton were patrolling West 10th Avenue near its intersection with Mariposa Street in Denver, Colorado, in a marked police vehicle. It was dark out and the intersection was unlit. The two officers observed Mr. Hernandez walking next to a fenced construction site. The officers considered this part of town “to be a high-crime area due to its proximity to the Lincoln Park housing project and the frequency of theft and drug dealing occurring therein.” Aplt. App. at 108.
As the district court found, Officer Mor-ghem immediately suspected for several reasons that Mr. Hernandez was engaged in criminal activity:
First, Mr. Hernandez was dressed entirely in black clothing and wore two backpacks. Second, Officer Morghem had been notified of prior thefts of construction materials and copper piping from construction sites. In particular, at least a month prior to this incident, Officer Morghem had arrested an individual for trespassing inside of the construction area and stealing sheet metal. He also believed that Mr. Hernandez might be acting as a “lookout” for thefts — though he admitted that he did not see other individuals walking around in the construction site or notice anything occurring within the site to arouse his suspicion. Third, Morghem found it “odd” that Mr. Hernandez was walking next to the construction site, because there was *1261 a sidewalk he could have used on the other side of the street.
Id. at 108.
The officers pulled alongside Mr. Hernandez in their police cruiser and Officer Morghem began talking to Mr. Hernandez through the open window. During this exchange, the officers used normal speech, did not shine a spotlight or flashlight on Mr. Hernandez, and kept their firearms holstered inside the cruiser. Officer Mor-ghem first asked Mr. Hernandez if they could talk to him, to which Mr. Hernandez responded by saying, “Yeah, what’s up?” Id. at 109. Mr. Hernandez kept walking while he responded to Officer Morghem’s question, and the officers “had to continue driving in order to follow him during their conversation.” Id. Officer Morghem next asked Mr. Hernandez where he was coming from and what he was doing, to which Mr. Hernandez replied that he was coming from his grandmother’s house and was “just trying to go home.” Id. Officer Mor-ghem pressed Mr. Hernandez for his grandmother’s address, but Mr. Hernandez could not remember it. Up to this point, the entire conversation took place while Mr. Hernandez was walking, with the two officers driving close beside him. Officer Walton noted in the police report he filed the next day that Mr. Hernandez “tried not to stop and talk to us.” Id. at 80.
Officer Walton asked Mr. Hernandez if he would stop so they could talk to him. Mr. Hernandez complied and stopped walking. Officer Morghem then asked Mr. Hernandez for his name and date of birth. Mr. Hernandez provided his real name but a false birth date. Although Officer Mor-ghem did not have Mr. Hernandez’s correct date of birth, he was able to pull up additional information on Mr. Hernandez via the in-car computer. He found Mr. Hernandez’s mug shot and determined that he had an active warrant for a parole violation.
When Officer Morghem informed Officer Walton about the active warrant, Officer Walton put the car in park and both officers exited the vehicle to approach Mr. Hernandez. Once Mr. Hernandez saw the officers exit, he began to walk away quickly. Officer Morghem noticed Mr. Hernandez reach for his left waistband and asked him if he had a gun. Mr. Hernandez replied, “yes,” and Officer Walton quickly grabbed his arm. A black revolver fell to the ground, and the officers placed Mr. Hernandez under arrest.
Mr. Hernandez was indicted on one. count of being a felon in possession of a firearm under 18 U.S.C. § 922(g)(1). He filed a motion to suppress, alleging that the seizure of his person was unreasonable under the Fourth Amendment because “it was not based on reasonable, articulable suspicion.” Aplt. App. at 11. After an evi-dentiary hearing, the district court granted the motion, concluding that the officers had “seized” Mr. Hernandez without reasonable suspicion to do so, in violation of the Fourth Amendment. Regarding the “seizure,” the court held that Officer Walton’s request to Mr. Hernandez to stop walking was “a show of authority such that a reasonable person in [his] position would not have felt free to decline the Officers’ requests or terminate the encounter.” Id. at 114. With respect to reasonable suspicion, the court reasoned that the officers had nothing more than inchoate and inarticulate hunches for suspecting Mr. Hernandez of criminal activity.
II
We first address an issue that arose after briefing and oral arguments were completed in this case when the Supreme Court issued its opinion in Utah v. Strieff, — U.S. -, 136 S.Ct. 2056, 195 L.Ed.2d 400 (2016). The Court determined that the attenuation doctrine — a rule that *1262 allows courts to admit illegally obtained evidence as long as the connection between the evidence and the illegal method is sufficiently remote or attenuated — applies to situations where police officers illegally stop someone who they later realize has a valid, pre-existing, and untainted arrest warrant. Id. at 2063. After the Court’s decision in Strieff, the government in this case filed a supplemental authority letter pursuant to Fed. R. App. P. 28(j) (“Rule 28(j) letter”), requesting that we remand the case to the district court to determine if, and to what extent, Strieff applies to these facts. Mr. Hernandez contended in response that the government had waived the attenuation argument by failing to assert it below. We agree with Mr. Hernandez.
“It is well established that we will not consider issues raised for the first time in a Rule 28(j) letter ... because, in part, the language of Rule 28(j) ‘underscores that an appellant’s supplemental authority must relate.to an issue previously raised in a proper fashion....’” Thacker v. Workman, 678 F.3d 820, 842 (10th Cir. 2012) (citations omitted) (quoting United States v. Levy, 379 F.3d 1241, 1244 (11th Cir. 2004)). In Thacker, we rejected a party’s attempt to argue the impact of a recently decided Supreme Court case, which held that federal habeas courts could hear ineffective-assistance-of-trial-counsel claims that were not raised in the initial-review collateral proceeding if the defendant lacked effective post-conviction counsel. Id. at 842 (citing Martinez v. Ryan, 566 U.S. 1, 132 S.Ct. 1309, 182 L.Ed.2d 272 (2012)). Because Mr. Thacker “most certainly could have argued in his federal habeas petition ... that ineffective assistance of post-conviction counsel was the ‘cause’ for his failure to raise his ineffective assistance of trial counsel claim” but failed to do so until filing his Rule 28(j) letter, we refused to consider the issue. Id.
Similarly, even though the government in this case could not have predicted the outcome of Strieff, it could have argued, just as the State of Utah did in Strieff, that the attenuation doctrine should be applied in situations where a defendant is illegally stopped but the police later discover a valid, pre-existing, and untainted arrest warrant. In fact, the government had ample precedent to argue this point because two of our sister circuits had already adopted the same approach. See United States v. Green, 111 F.3d 515, 521-23 (7th Cir. 1997) (“Where a lawful arrest pursuant to a warrant constitutes the ‘intervening circumstance’ (as in this case), it is an even more compelling case for the conclusion that the taint of the original illegality is dissipated.”); see also United States v. Simpson, 439 F.3d 490, 495-97 (8th Cir. 2006) (holding the defendant’s “outstanding arrest warrant constituted an extraordinary intervening circumstance that purge[d] much of the taint associated with the officers’ unconstitutional conduct”).
We hold that the government has waived its attenuation argument.[1]
*1263 III
“In reviewing a district court’s ruling on a motion to suppress evidence, we view the evidence in the light most favorable to the prevailing party and accept the district court’s findings of fact unless they are clearly erroneous.” United States v. Oliver, 363 F.3d 1061, 1065 (10th Cir. 2004) (quoting United States v. Massie, 65 F.3d 843, 847 (10th Cir. 1995)). “A finding of fact is clearly erroneous if it is without factual support in the record or if, after reviewing all of the evidence, we are left with the definite and firm conviction that a mistake has been made.” In re Vaughn, 765 F.3d 1174, 1180 (10th Cir. 2014) (quoting In re Peterson Distrib., Inc., 82 F.3d 956, 959 (10th Cir. 1996)). In making this determination, we keep in mind that “[i]t is the province of the trial court to assess the credibility of witnesses at the suppression hearing and to determine the weight to be given to the evidence presented, and we must give such determinations due deference.” United States v. Le, 173 F.3d 1258, 1264 (10th Cir. 1999) (citing United States v. Hargus, 128 F.3d 1358, 1361 (10th Cir. 1997)). “The ultimate question of whether a search and seizure was reasonable under the Fourth Amendment is a question of law that we review de novo.” Oliver, 363 F.3d at 1065 (quoting Massie, 65 F.3d at 847).
While the defendant “bears the burden of proving whether and when the Fourth Amendment was implicated (i.e., the point at which he ... was ‘seized’),” United States v. Carhee, 27 F.3d 1493, 1496 (10th Cir. 1994), the “government bears the burden of proving the reasonableness of the officer’s suspicion.” United States v. Simpson, 609 F.3d 1140, 1146 (10th Cir. 2010). We address in turn the government’s contentions that the district court erred in holding Officers Walton and Morghem seized Mr. Hernandez without reasonable suspicion in violation of the Fourth Amendment.

A. Whether a Seizure Occurred

The Fourth Amendment, applied to the states through the Fourteenth Amendment, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), prohibits unreasonable seizures by law enforcement officers. U.S. Const, amend. IV. But “[t]he Fourth Amendment does not proscribe all contact between the police and citizens.” INS v. Delgado, 466 U.S. 210, 215, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). For instance, “law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen.” Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting Florida v. Royer, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983) (plurality opinion)). These are referred to as consensual encounters which do not implicate the Fourth Amendment. See United States v. Lopez, 443 F.3d 1280, 1283 (10th Cir. 2006). It is “[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that a court] may conclude that a ‘seizure’ has occurred.” Terry v. Ohio, 392 U.S. 1, 19 n.16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
In determining whether an encounter between a police officer and a citizen is consensual, “the crucial test is whether, taking into account all of the circumstances surrounding the encounter, the police conduct would ‘have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.’ ” Bostick, 501 U.S. at 437, 111 S.Ct. 2382 (quoting Michigan v. Chesternut, 486 U.S. 567, 569, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988)). “[T]he *1264 test allows officers to make inquiries so long as they don’t throw their official weight around unduly.” United States v. Tavolacci, 895 F.2d 1423, 1425 (D.C. Cir. 1990). There are no per se rules that govern this inquiry; “[rjather, every case turns on the totality of the circumstances presented.” United States v. Hill, 199 F.3d 1143, 1147 (10th Cir. 1999) (quoting United States v. Little, 18 F.3d 1499, 1503 (10th Cir. 1994) (en banc)).
We have enumerated a non-exhaustive list of factors to be considered in determining whether a reasonable person would feel free to terminate his encounter with the police:
the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant’s personal effects such as tickets or identification; and whether or not they have specifically advised defendant at any time that he had the right to terminate the encounter or refuse consent.
Lopez, 443 F.3d at 1284 (quoting United States v. Spence, 397 F.3d 1280, 1283 (10th Cir. 2005)). Moreover, when police officers pursue a citizen in their squad car while the citizen is on foot, courts will consider whether the officers activated their siren or flashers, operated their car in an aggressive manner to block the citizen’s course or otherwise control the direction or speed of his movement, displayed their weapons, or commanded the citizen to halt. Chesternut, 486 U.S. at 575, 108 S.Ct. 1975. “Although no single factor is disposi-tive, the ‘strong presence of two or three factors’ may be sufficient to support the conclusion a seizure occurred.” Lopez, 443 F.3d at 1284-85 (quoting Fuerschbach v. Sw. Airlines Co., 439 F.3d 1197, 1203 (10th Cir. 2006)).
Turning to this case, the encounter in question began when Officers Morghem and Walton pulled alongside Mr. Hernandez in their police cruiser and began asking him questions, which he answered as he continued to walk down the street. This was not a seizure. See Bostick, 501 U.S. at 434, 111 S.Ct. 2382 (“Our cases make it clear that a seizure does not occur simply because a police officer approaches an individual and asks a few questions.”). The nature of a police-citizen encounter can change, however, and “what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa.” United States v. Madden, 682 F.3d 920, 925 (10th Cir. 2012) (quoting United States v. Zapata, 997 F.2d 751, 756 n.3 (10th Cir. 1993)). That was the case here.
The district court correctly identified the standards applicable to determining whether a police-citizen encounter is consensual or a seizure. The court recognized that “[n]o per se or absolute rules govern the inquiry ...; rather, every case turns on the totality of the circumstances presented.” Aplt. App. at 111. Citing Spence, 397 F.3d at 1283, the court detailed the factors relevant to making this determination, as we have done supra.
Applying these standards, the district court determined the facts here weighed in favor of concluding that the officers’ conduct had crossed the coercive line and that a seizure had occurred. A key factor was Officer Walton’s request that Mr. Hernandez stop walking, but the court also emphasized that there were two uniformed officers closely following Mr. Hernandez in a police car, it was dark and there was no evidence the encounter oc *1265 curred within the view of other persons, and the officers did not advise Mr. Hernandez he had the right to terminate the encounter. Aplt. App. at 115-16. The Supreme Court has recognized that “the very presence of a police car driving parallel to a [ ] pedestrian could be somewhat intimidating.” [2] Chesternut, 486 U.S. at 575, 108 S.Ct. 1975. It was in this setting that Officer Walton “requested” Mr. Hernandez to stop walking. As we have noted above, even Officer Walton recognized in his contemporaneous police report that Mr. Hernandez “tried not to stop to talk to us.”[3] Aplt. App. at 80. Reading the circumstances of this case, as we must, in the light most favorable to the prevailing party, Mr. Hernandez, we are persuaded a reasonable person would have believed that compliance with the “request” was not optional.
The government takes issue with numerous findings made by the district court and we address each in turn. The government first contends the court failed to adequately address the Spence factors, claiming the court’s treatment of the factors was cursory to its overriding concern that Officer Walton asked Mr. Hernandez to stop walking so they could talk to him. The government maintains the district court erred in giving so much weight to Officer Walton’s request because “[o]fficers are free to approach individuals on the street and question them.” Aplt. Br. at 9. While this is true, Spence’s list of factors is non-exhaustive, and the district court did not err in heavily weighing Officer Walton’s request for Mr. Hernandez to stop walking in light of the other circumstances present that evening. Mr. Hernandez was in an unlit area on a dark night with no one else around and with two uniformed and armed officers closely following him in a marked police car after he had indicated by walking away that he did not want to stop to talk with them. The Court made clear in Chesternut, 486 U.S. at 573, 108 S.Ct. 1975, that “what constitutes a restraint on liberty prompting a person to conclude he is not free to ‘leave’ will vary, not only with the particular police conduct at issue, but also with the setting in which the conduct occurs.” (Emphasis added).
The government maintains the district court erred in finding that the public exposure factor favored Mr. Hernandez. It reasons that whether anybody is around to see the questioning is irrelevant as long as the questioning occurs in a public place. We disagree. Our cases view police-citizen interactions in nonpublic places and police-citizen interactions in the absence of other members of the public similarly. See Spence, 397 F.3d at 1283 (“This court does consider ‘interaction in a nonpublic place ... and the absence of other members of the public’ as factors pointing toward a nonconsensual encounter.” (quoting United States v. Sanchez, 89 F.3d 715, 718 (10th Cir. 1996))).
The government also disagrees with the district court’s treatment of the fact that *1266 multiple officers were involved, arguing that “this court should reject the district court’s implicit holding that an officer must approach a subject alone, or his presence will be deemed coercive.” Aplt. Br. at 11. But that is not what the district court held. It merely stated that the number of officers is one of many factors to consider, citing one of our cases for the proposition that “the presence of more than one officer increases the coerciveness of an encounter.” United States v. Ward, 961 F.2d 1526, 1538 (10th Cir. 1992), overruled on other grounds by Little, 18 F.3d at 1504. Although the presence of two uniformed and armed officers does not automatically transform every police-citizen encounter into a nonconsensual one, it is a relevant factor.
“[A]n individual is ‘seized’ when he has an objective reason to believe that he is not free to terminate his conversation with the officer and proceed on his way.” United States v. Patten, 183 F.3d 1190, 1194 (10th Cir. 1999) (citation omitted). “The question of whether an encounter was consensual ‘calls for the refined judgment of the trial court.’ ” Id. at 1194 (quoting United States v. Werking, 915 F.2d 1404, 1408 (10th Cir. 1990)). Considering the totality of the circumstances here, that there were two uniformed police officers driving closely alongside Mr. Hernandez in the dark with no one else around, and that Mr. Hernandez did not stop walking until one officer asked him to stop even though he was answering the officers’ questions, the district court did not err in concluding there was a show of authority by Officers Morghem and Walton sufficient to constitute a seizure under the Fourth Amendment.
The dissent claims that United States v. Drayton, 536 U.S. 194, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), INS v. Delgado, 466 U.S. 210, 104 S.Ct. 1758 (1984), Florida v. Rodriguez, 469 U.S. 1, 105 S.Ct. 308, 83 L.Ed.2d 165 (1984) (per curiam), and United States v. Mendenhall, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), where the Supreme Court held that each police-citizen encounter was not a seizure, represent “far more authoritative encounters between officers and citizens” than does this case. Dissent at 1270. We disagree. In Rodriguez, 469 U.S. at 3-4, 105 S.Ct. 308, the defendant was stopped in an airport by two detectives in plain clothes. One officer showed the defendant his badge and asked if he could talk to him. The Court held this initial encounter was not a seizure. Id. at 5-6, 105 S.Ct. 308. This encounter — with plain clothes detectives in a very public place where the defendant was never asked to stop walking as he was moving away from the officer — is nothing like the encounter in the present case, which took place in an isolated location on a dark night with uniformed police officers closely following defendant in a police car. In fact, in Rodriguez, the Court went on to “[a]s-sum[e], without deciding, that after [the defendant] agreed to talk to the police, moved over to where his cohorts and the other detective were standing, and ultimately granted permission to search his baggage, there was a ‘seizure.’ ” Id. at 6, 105 S.Ct. 308.
In Delgado, 466 U.S. at 212, 104 S.Ct. 1758, multiple INS agents conducted a survey of a factory in search of undocumented immigrants. Agents were posted at the doors while other agents walked through the factory and stopped employees to ask about their citizenship status. Id. The Court held that no seizure occurred. Id. at 221, 104 S.Ct. 1758. But the degree of coerciveness of an encounter in a factory with numerous people around during work time is completely different than an encounter with the police alone at night, on an empty street. Moreover, a key premise of the Delgado holding was that “when people are at work their freedom to move *1267 about has been meaningfully restricted, not by the actions of law enforcement officials, but by the workers’ voluntary obligations to their employers.” Id. at 218, 104 S.Ct. 1758.
In Mendenhall, 446 U.S. at 548, 100 S.Ct. 1870, DEA agents stopped a woman at the airport, asked for her ID, and returned it after they looked at it. They then asked her if she would follow them to answer a few more questions, and she did so. Id. A plurality of the Court assumed without deciding that the initial stop was a seizure and then concluded it was supported by reasonable suspicion. Id. at 560-66, 100 S.Ct. 1870 (Powell, J., concurring). Only two Justices held the initial stop was consensual. Id. at 555, 100 S.Ct. 1870 (opinion of Stewart, J.). A majority of the Court held, and this is what the dissent focuses on, that the encounter between Mendenhall and the officers was consensual as they walked from the concourse to the DEA office. Id. at 557-58, 100 S.Ct. 1870. From this, the dissent concludes that if the encounter in Mendenhall was consensual, so too was the encounter here. But, unlike the present case, the setting in Mendenhall was a public airport and there was never a moment after the initial encounter when the police asked Ms. Men-denhall to stop behaving in a certain manner (e.g., to stop walking) while she was answering their questions.
Finally, in Drayton, 536 U.S. at 198, 122 S.Ct. 2105, two officers dressed in plain clothes boarded a bus and asked the defendant if he had any bags with him. The defendant responded affirmatively and let them check his bag. Id. at 199, 122 S.Ct. 2105. When the search did not turn up contraband, the officers asked if they could check his person and the defendant again cooperated. Id. The Court held there was no seizure. Id. at 200, 122 S.Ct. 2105. It disagreed with the Eleventh Circuit’s “per. se rule that evidence obtained during sus-picionless drug interdiction efforts aboard buses must be suppressed unless the officers have advised passengers of their right not to cooperate and to refuse consent to search[,]” ultimately concluding that the focus should be on the coerciveness of the encounter and not the fact that it took place on a bus. Id. at 202, 122 S.Ct. 2105.
As we have explained excessively now, Mr. Hernandez was alone at night being closely followed by a police car with two uniformed and armed officers who asked him to stop walking even though he was answering their questions. In contrast, the defendant in Drayton was surrounded by people, was questioned by plainclothes officers, and was never asked to stop acting in a particular way. The dissent describes the bravery it would have taken for the defendant in Drayton to terminate his encounter with the officers but fails to mention that he “would have been allowed to do so without argument.” See id. at 198, 122 S.Ct. 2105. Mr. Hernandez attempted the very act that would have been permitted in Drayton, but he was asked to halt.
We admit this is a close case and there is a dearth of case law directly on point with the facts here, but to claim that numerous Supreme Court precedents have held “consensual far more authoritative encounters between officers and citizens,” Dissent at 1270, is simply incorrect and misleading. Reading the record in the light most favorable to Mr. Hernandez, see United States v. De la Cruz-Tapia, 162 F.3d 1275, 1277 (10th Cir. 1998), we cannot say the district court erred in concluding that a reasonable person in Mr. Hernandez’s circumstances would not have felt free to leave.

B. Whether the Officers had Reasonable Suspicion to Stop Mr. Hernandez

Because the seizure of Mr. Hernandez constituted an investigative de *1268 tention, also known as a “Terry stop,” it can only be justified if the officers had specific and articulable facts and rational inferences drawn from those facts giving rise to a reasonable suspicion that Mr. Hernandez was involved in criminal activity. See Terry, 392 U.S. at 21, 88 S.Ct. 1868; see also Werking, 915 F.2d at 1407. Because a Terry stop is less intrusive than an arrest, the suspicion required to make such a stop is less demanding than what is required for an arrest. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). As the Court in Sokolow reiterated, id. the standard articulated in Terry does not “invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches.” 392 U.S. at 22, 88 S.Ct. 1868. Rather, the Fourth Amendment requires at least “ ‘some minimal level of objective justification’ for making [a] stop.” Sokolow, 490 U.S. at 7, 109 S.Ct. 1581 (quoting Delgado, 466 U.S. at 217, 104 S.Ct. 1758). Importantly, it is the government’s burden to prove the reasonableness of the officer’s suspicion. Simpson, 609 F.3d at 1146.
As the district court recognized, aplt. app. at 113, “the existence of objectively reasonable suspicion of illegal activity does not depend upon any one factor, but on the totality of the circumstances.” United States v. Wood, 106 F.3d 942, 946 (10th Cir. 1997). The district court held that the generalized explanation provided by the officers for the detention amounted to “nothing more than inchoate and inarticulate hunches, rather than a ‘particularized and objective basis,’ for suspecting Mr. Hernandez of criminal activity.” Aplt. App. at 117-18 (citing Terry, 392 U.S. at 22, 88 S.Ct. 1868; United States v. Fisher, 597 F.3d 1156, 1158-59 (10th Cir. 2010)). The court analyzed the four reasons articulated by the officers, and argued by the government, to support reasonable suspicion:
(1) Mr. Hernandez was walking next to a construction site which had been the previous target of construction material thefts; (2) he was walking in a “high crime” area (with regard to theft, gang activity, and drug dealing); (3).he was not using the sidewalk located on the other side of the street; and (4) he was wearing all black clothing and carrying two backpacks.
Aplt. App. at 117.
First, the court held that merely walking next to a construction site that was previously the target of thefts did not support reasonable suspicion because Mr. Hernandez was not, for example, inside the fence, carrying construction materials, or acting as a lookout. As we said in Fisher, 597 F.3d at 1158-59, “[a] police officer cannot legally detain a person simply because criminal activity is afoot. The particular person that is stopped must be suspected of criminal activity.” Second, the district court noted that, while relevant, the location of the stop in a high-crime area is “not sufficient by itself to support a reasonable suspicion” that the individual himself is engaged in criminal activity. Aplt. App. at 113; see also United States v. Clarkson, 551 F.3d 1196, 1201 (10th Cir. 2009). Third, the court stated that Mr. Hernandez’s failure to use the sidewalk located on the other side of the street did not support reasonable suspicion because “such behavior [was] perfectly innocuous— Mr. Hernandez might well have decided to take a shorter route to his destination, or to see the progress of the neighborhood’s latest highrise development.” Aplt. App. at 118. The court pointed out that “[t]he government did not explain why suspicious persons- are less likely to choose the sidewalk.” Id. Nor does the government do so on appeal. Finally, the district court was not persuaded that Mr. • Hernandez’s all black clothing and two backpacks supported reasonable suspicion because if *1269 “black clothing were sufficient to confer reasonable suspicion, it could subject the ambling public (or, at least its Hispanic members) ‘to virtually random seizures, inquisitions to obtain information which could then be used to suggest reasonable suspicion, and arbitrary exercises of police power.’ ” Id. at 118-19 (quoting Wood, 106 F.3d at 948).
Notably, the government does not contend the district court incorrectly evaluated these facts. Nor does the government even claim the district court erred in concluding the four factors the officers articulated were not sufficient to constitute reasonable suspicion that Mr. Hernandez was engaged in criminal activity, a position with which we agree.
The government contends instead that the district court failed to account for one “critical undisputed fact”: that Mr. Hernandez said he was coming from his grandmother’s house but could not recite her address. Aplt. Br. at 16. The government asserts that “[w]hen this is factored in, the circumstances suffice to show particularized suspicion of criminal activity.” Id. at 17. But the government never argued in district court, either in its response to the motion to suppress, Aplt. App. at 25-26, or in its argument at the evidentiary hearing, id. at 94-100, that Mr. Hernandez’s failure to recall his grandmother’s address was a factor supporting reasonable suspicion. Nor does the government offer any excuse for its failure to make this argument previously.
“In order to preserve the integrity of the appellate structure, we should not be considered a ‘second-shot’ forum, a forum where secondary, back-up theories may be mounted for the first time. Parties must be encouraged to ‘give it everything they’ve got’ at the trial level.” Tele-Communications, Inc. v. Comm’r, 104 F.3d 1229, 1233 (10th Cir. 1997) (quoting Anschutz Land & Livestock Co. v. Union Pac. R.R., 820 F.2d 338, 344 n.5 (10th Cir. 1987)). We, therefore, need not address the new reasonable suspicion argument the government makes for the first time on appeal. See United States v. Dewitt, 946 F.2d 1497, 1499 (10th Cir. 1991) (“[T]he government has waived this issue by failing to raise it below. We will not consider issues which are raised for the first time on appeal unless a party demonstrates an impediment which prevented raising the argument below.” (citing United States v. Orr, 864 F.2d 1505, 1508 (10th Cir. 1988))).[4]
In any event, however, we do not consider Mr. Hernandez’s failure to know his grandmother’s street address worthy of much weight in determining whether the officers had reasonable suspicion to detain him, unlike the dissent. In analyzing the totality of the circumstances, “common sense and ordinary experience are to be employed and deference is to' be accorded to a law enforcement officer’s ability to distinguish between innocent and suspicious actions.” De la Cruz-Tapia, 162 F.3d at 1277 (quoting Wood, 106 F.3d at 946). Tellingly, neither officer in this case mentioned in his testimony that this fact made him suspicious, which is understandable because ordinary experience tells us that a grandchild who knows the familiar way to his grandmother’s house may well not know her exact street address. Cf. United States v. Santos, 403 F.3d 1120, 1131 (10th Cir. 2005) (failure to know mother’s telephone number not entitled to much weight in reasonable suspicion analy-. sis considering that “[m]any modern peo- *1270 pie, even innocent ones, program important phone numbers into their telephones and no longer memorize them”). As we said in Santos, “[i]t may be lamentable that” a grandchild doesn’t know his grandmother’s street address, “but it is hardly an indication that crime is afoot.” Id. We are thus more persuaded by the police officers’ failure to find this fact suspicious than we are by the dissent’s opposite conclusion.[5]
The government ultimately argues the district court erred by not affording the officers the deference they deserved. But as we have explained, while “deference is to be accorded a law enforcement officer’s ability to distinguish between innocent and suspicious actions ... [i]nchoate suspicions and unparticularized hunches ... do not provide reasonable suspicion.” Wood, 106 F.3d at 946. The district court held that Officers Morghem and Walton stopped Mr. Hernandez based on inchoate suspicions and unparticularized hunches, and we are not persuaded the court erred in making that determination.
We AFFIRM.

. While we do not generally consider new issues on appeal, we do have discretion to consider new arguments based on "changes in governing law arising during the pendency of the appeal.” Green v. Bd. of Cty. Comm’rs, 472 F.3d 794, 798 n.1 (10th Cir. 2007) (quoting Anixter v. Home-Stake Prod. Co., 77 F.3d 1215, 1222 (10th Cir. 1996)). We see two reasons not to exercise that discretion here. First, all of the parties in Green agreed that the appellate record was sufficiently developed to allow proper consideration of the new issue without remand. Id. The same cannot be said about this case. Second, Strieff does not change governing law; it only supplements it by applying the factors from Brown v. Illinois, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), and concluding that suppression was unwarranted. See Strieff, 136 S.Ct. at 2061-62.

. Of course, we recognize that "this kind of police presence does not, standing alone, constitute a seizure." Id. We also recognize the ultimate conclusion in Chesternut was that no seizure had occurred. Id. at 576, 108 S.Ct. 1975. We are merely highlighting the fact that Officers Walton and Morghem were driving parallel to Mr. Hernandez in their police cruiser and that the Supreme Court has stated this exact fact could be intimidating to a pedestrian. It is not dispositive; it simply further illustrates the coerciveness of the circumstances leading up to Officer Walton’s request that Mr. Hernandez stop walking, which is the point at which the Fourth Amendment was implicated.

. We do not include this to say that Officer Walton’s subjective intentions matter to the question of whether Mr. Hernandez was seized; rather, we use it to illustrate what the situation objectively looked like from a contemporaneous account.

. This case is not like United States v. Moore, 795 F.3d 1224, 1229 n.2 (10th Cir. 2015), where there was no issue of waiver.

. The record is virtually bare in regard to Mr. Hernandez’s inability to recall his grandmother’s address. The only mention of it was during Officer Morghem’s testimony at the suppression hearing where he stated, “1 asked where was his grandma’s house and he could not provide me that address.” Aplt. App. at 43. This, standing alone, contrary to the government’s and dissent's assertions, is neither inconsistent nor evasive. It might be different, for instance, had Officer Morghem testified to asking a follow-up question regarding the approximate location of Mr. Hernandez’s grandmother’s house and then testified that Mr. Hernandez could not provide any general information about such residence. That, however, is not what occurred, and it further underscores our point above that both sides should present all their arguments to the district court.