**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 20, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

JOSEPH JUSTIN GATES,

    Defendant - Appellant.

No. 20-4106
(D.C. No. 1:19-CR-00027-DB-1)
(D. Utah)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **McHUGH**, **BALDOCK**, and **BRISCOE**, Circuit Judges.
_____

Joseph Justin Gates entered a conditional guilty plea to one count of being a felon in possession of a firearm and ammunition, reserving the right to challenge the district court's denial of his motion to suppress. We conclude that Mr. Gates was not seized until Officer Curtis Ricks exited his patrol car, ordered Mr. Gates to "come here," and drew and deployed his taser. We further conclude that reasonable suspicion supported Mr. Gates's seizure at that juncture. Therefore, we affirm the district court's denial of Mr. Gates's motion to suppress and affirm Mr. Gates's conviction.

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

## I.    BACKGROUND

### A.    *Mr. Gates's Arrest*

On a cold March evening when some snow covered the ground, Officer Ricks, who had twenty-two years of experience as a police officer and six years of experience with the South Ogden City Police Department, conducted a vehicle patrol in the area of 37th Street and Riverdale Road in South Ogden City, Utah. Around 11:00 p.m. Officer Ricks was driving west on 37th Street toward the intersection of Riverdale Road in a marked, black South Ogden City patrol car with the word "police" down the side and overhead emergency lights on the roof. As he approached a strip mall with a twenty-four-hour, self-service carwash, Officer Ricks spotted Mr. Gates. Mr. Gates was initially standing near a carwash bay that housed a coin machine and power box for the car wash. The bays of the carwash have three walls, a roof, and an opening in the front through which cars can enter. Officer Ricks did not see any vehicle or other items that might be washed in proximity of the carwash bay and Mr. Gates. As Officer Ricks approached in his vehicle, Mr. Gates moved behind and crouched below a four- to five-foot retaining wall. Officer Ricks found Mr. Gates's location and conduct suspicious and intended to turn into the strip mall, by using an entrance near the intersection of 37th Street and Riverdale Road, to further observe Mr. Gates's actions. But, before Officer Ricks could drive the short

distance to the intersection, he saw, through his rearview mirror, Mr. Gates climb the retaining wall and run across the middle of 37th Street.

Officer Ricks made a U-turn, activated his "alley light" (a non-emergency spotlight), and pulled up alongside Mr. Gates as Mr. Gates walked on a sidewalk. When Officer Ricks reached Mr. Gates's position, he lowered the window on his patrol car and called out to Mr. Gates, seeking an explanation for Mr. Gates's presence at the carwash near the coin machine.[1] Mr. Gates responded by moving away from Officer Ricks's car, behavior which Officer Ricks perceived as Mr. Gates starting to "conceal[] himself." *Id.* at 31. Officer Ricks also observed a "bulge" on Mr. Gates's "waistline" that was outside of his tucked in shirt. *Id.* at 30. But Officer Ricks was not able to identify the object causing the bulge.

With Mr. Gates moving away from him and having observed the bulge, Officer Ricks exited his vehicle and instructed Mr. Gates to "come here." *Id.* at 31. Mr. Gates did not obey this command and, instead, attempted to flee on foot. Officer Ricks pursued Mr. Gates and deployed his taser in an effort to halt Mr. Gates's flight. The taser temporarily stopped Mr. Gates, but he removed one of the probes and continued running. In continued pursuit, Officer Ricks tackled, struggled with, and ultimately subdued Mr. Gates. Officer Ricks identified the bulge in Mr. Gates's waistline as a

---

[1] Although there is body camera video of Officer Ricks's interaction with Mr. Gates, Officer Ricks did not activate the camera and the audio recording when making initial contact with Mr. Gates. Rather, the audio activated only when Mr. Gates fled a few moments after Officer Ricks made initial contact with him. Accordingly, we rely primarily on Officer Ricks's suppression hearing testimony when describing his interaction with Mr. Gates prior to Mr. Gates's flight.

loaded .44 caliber revolver. Mr. Gates was arrested on several state charges. At the time of his arrest, Mr. Gates had eight prior criminal convictions, including three felony convictions.

### B.    *Procedural History*

A federal grand jury indicted Mr. Gates on one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Mr. Gates filed a motion to suppress the firearm Officer Ricks recovered. The district court held a suppression hearing at which only Officer Ricks testified. Officer Ricks testified about his encounter with Mr. Gates and his basis for believing Mr. Gates was about to engage in criminal conduct when he spotted him at the carwash near the coin machine. Officer Ricks also testified that the area of 37th Street and Riverdale Road had been "deemed a high-crime area." *Id.* at 21. In support of this categorization, Officer Ricks relied upon his personal experience patrolling the area, noting that he spent 80% of his twelve-hour patrol shifts in the area of 37th Street and Riverdale Road because of the crime rate in the area. Officer Ricks identified several types of crimes he had previously worked in the area, including "[r]etail thefts, thefts, burglaries, drug sales, drug distribution, drug use," and "a couple of robberies." *Id.*

Through post-hearing briefing, Mr. Gates argued Officer Ricks lacked reasonable suspicion to conduct a *Terry*[2] stop when Officer Ricks approached him.

---

[2] *See Terry v. Ohio*, 392 U.S. 1 (1968).

Inherent in Mr. Gates's argument was that Officer Ricks's initial contact with him—in which Officer Ricks, from the patrol car, asked Mr. Gates about his purpose for being at the carwash—qualified as a seizure. The Government argued (1) Mr. Gates was not seized until Officer Ricks exited his vehicle and ordered Mr. Gates to "come here" such that the bulge on Mr. Gates's waistline was part of the reasonable suspicion calculus; and (2) even if Mr. Gates was seized when Officer Ricks first approached, Officer Ricks had reasonable suspicion at that point based on Mr. Gates's presence in a high-crime area late at night, his presence at the carwash near the coin machine and without a vehicle, and his evasive behavior. Mr. Gates countered that the Government had not established that the area of 37th Street and Riverdale Road was a high-crime area.

The district court denied Mr. Gates's motion to suppress and announced two conclusions in reaching its ruling. First, the district court concluded Mr. Gates was not seized until Officer Ricks exited his vehicle and ordered him to "come here." In support of this conclusion, the district court observed (1) Officer Ricks did not activate the emergency lights on his patrol car, (2) Officer Ricks remained in his patrol car when initially speaking to Mr. Gates, (3) Officer Ricks did not display a weapon, (4) Officer Ricks approached Mr. Gates in a non-aggressive manner, (5) Mr. Gates's movement and course of travel was not blocked or restrained, and (6) Officer Ricks did not initially command Mr. Gates to stop. Second, the district court concluded Officer Ricks had reasonable suspicion to stop Mr. Gates at the outset based on Mr. Gates's presence at the carwash near the coin machine and

without a car, the high-crime nature of the area, the time of day, and Mr. Gates's attempt to conceal himself and then flee from the carwash.

Following denial of his motion to suppress, Mr. Gates entered a conditional guilty plea, preserving the suppression issue for appeal. The district court sentenced Mr. Gates to a term of 27 months' imprisonment, to be followed by a 36-month term of supervised release. Mr. Gates timely filed this appeal. On appeal, Mr. Gates renews his arguments that (1) he was seized when Officer Ricks initiated contact with him by pulling alongside him and asking about his presence at the carwash; and (2) Officer Ricks lacked reasonable suspicion to seize him at that point in time. Encompassed in this second proposition, Mr. Gates argues the Government failed to adequately support the conclusion that the area of 37th Street and Riverdale Road was a high-crime area.

## II.    DISCUSSION

We state the standard of review before analyzing the point at which Mr. Gates was seized and whether reasonable suspicion supported the seizure at that time.

### A.    *Standard of Review*

We apply an overarching de novo standard of review to a district court's denial of a motion to suppress. *United States v. Juszczyk*, 844 F.3d 1213, 1214 (10th Cir. 2017). The question of when a seizure occurred is a question of law subject to de novo review. *United States v Salazar*, 609 F.3d 1059, 1063–64 (10th Cir. 2010). Likewise, whether a seizure is reasonable is a question of law that we review de novo. *United States v. Morales*, 961 F.3d 1086, 1090 (10th Cir. 2020). But, "[i]n

applying de novo review, we view the evidence in the light most favorable to the ruling and review the district court's factual findings under the clear-error standard."[3] *Juszczyk*, 844 F.3d at 1214. "A district court's factual finding is clearly erroneous when it is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *Morales*, 961 F.3d at 1090 (quotation marks omitted). In conducting this clear-error review within the context of a suppression motion, an appellate court should "give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Ornelas v. United States*, 517 U.S. 690, 699 (1996).

### B.    When was Mr. Gates Seized?

The parties agree Mr. Gates was seized at the point when Officer Ricks ordered him to "come here" and drew and deployed his taser. But Mr. Gates contends he was seized moments earlier when Officer Ricks first pulled his patrol car alongside Mr. Gates. Before we undertake our de novo analysis, we discuss the legal framework used to determine whether an individual is seized.

### 1.    Governing Law

"[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "[E]ven when officers have no basis for suspecting a particular individual, they may

---

[3] In a footnote, Mr. Gates challenges the proposition that we view the evidence in the light most favorable to the district court's ruling; but he acknowledges his challenge is foreclosed by circuit precedent and that he raises the challenge only for the purpose of preserving the issue for further review.

generally ask questions of that individual . . . as long as the police do not convey a message that compliance with their requests is required." *Id.* at 434–35. Thus, "[a] seizure occurs for Fourth Amendment purposes when 'a reasonable person would have believed that he was not free to leave.'" *Jones v. Hunt*, 410 F.3d 1221, 1225 (10th Cir. 2005) (quoting *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988)). This assessment is based on "what a reasonable, law-abiding person would have thought had he been in the defendant's shoes," and not based on "what the defendant himself thought." *United States v. Tafuna*, 5 F.4th 1197, 1200 (10th Cir. 2021).

In assessing whether a reasonable person in the defendant's position would have felt free to leave, a court takes a holistic "totality-of-the-circumstances" approach. *United States v. Ringold*, 335 F.3d 1168, 1172 (10th Cir. 2003). Factors to consider include:

> (1) the threatening presence of several officers; (2) the brandishing of a weapon by an officer; (3) physical touching by an officer; (4) aggressive language or tone of voice by an officer indicating compliance is compulsory; (5) prolonged retention of an individual's personal effects; (6) a request to accompany an officer to the police station; (7) interaction in a small, enclosed, or non-public place; . . . (8) absence of other members of the public . . . [; and (9)] whether an officer indicated to the person that he is free to leave.

*United States v. Jones*, 701 F.3d 1300, 1313 (10th Cir. 2012) (internal quotation marks omitted). This list of factors "is not exhaustive," and "no single factor is dispositive." *Id*. But "the strong presence of two or three factors may be sufficient to support the conclusion a seizure occurred." *United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (quotation marks omitted).

In assessing an officer's verbal interaction with an individual, we have "made clear that the mere fact that [an officer] *ask*[*s*] incriminating questions is not relevant to the totality-of-the-circumstances inquiry—what matters instead is the manner in which such questions were posed." *Ringold*, 335 F.3d at 1173 (internal quotation marks omitted). In this sense, "[a]ccusatory, persistent, and intrusive questioning can turn an otherwise voluntary encounter into a coercive one." *Id.* at 1174 (quotation marks omitted). Thus, "[t]he nature of a police-citizen encounter can change . . . and what may begin as a consensual encounter may change to an investigative detention if the police conduct changes." *Hernandez*, 847 F.3d at 1264 (internal quotation marks omitted).

There are also specific considerations for assessing situations involving a police officer operating a vehicle when approaching an individual. The Supreme Court has recognized that "the very presence of a police car driving parallel to a [] pedestrian could be somewhat intimidating." *Chesternut*, 486 U.S. at 575. But, "standing alone," this is not enough to constitute a seizure. *See Hernandez*, 847 F.3d at 1265 n.2 (quotation marks omitted) (observing that the Supreme Court in *Chesternut* held individual was not seized despite patrol car driving alongside individual before interaction). "[W]hen [a] police officer[] pursue[s] a citizen in their squad car while the citizen is on foot, courts will consider whether the officer[] activated their siren or flashers, operated their car in an aggressive manner to block the citizen's course or otherwise control the direction or speed of his movement, displayed their weapons, or commanded the citizen to halt." *Id.* at 1264. An officer

9

shining a bright, non-emergency light at an individual "is not inherently coercive."
*Tafuna*, 5 F.4th at 1201 (collecting authority on this point and noting that an opposing rule would place officer safety at risk when approaching a vehicle or individual at night).

## 2.    Application

The totality of the circumstances overwhelmingly favors the conclusion that Mr. Gates was not seized when Officer Ricks first approached and inquired about Mr. Gates's presence at the carwash. Officer Ricks was the only officer present, he remained in his patrol car, and he spoke to Mr. Gates from a distance. Thus, when Officer Ricks initiated the interaction, he was not in a position to restrain Mr. Gates or to take possession of Mr. Gates's personal effects.[4] Nor did Officer Ricks display a weapon when he initially attempted to converse with Mr. Gates. Similarly, at that point in the encounter, Officer Ricks neither gave Mr. Gates any commands nor ordered him to take or refrain from any action. Further, although the interaction occurred at night when few members of the public may have been out-and-about, it happened on a public street where the degree of coercion is generally diminished. Finally, Officer Ricks asked a single question in an effort to obtain information,

---

[4] Mr. Gates's initially unimpeded flight following Officer Ricks's question supports the conclusion that Mr. Gates was neither objectively restrained nor felt subjectively restrained.

doing so without lobbing any direct accusations at Mr. Gates, no less a series of accusatory or intrusive questions.

Mr. Gates attempts to overcome the conclusion that he was not seized at the outset of the interaction by pointing to two considerations—Officer Ricks did not advise him he was free to leave and Officer Ricks approached him in a patrol car. While both considerations are certainly factors in our analysis, we find them to be of little weight when viewed as part of the totality of the circumstances. As to the first consideration, although it is true Officer Ricks did not advise Mr. Gates he was free to leave, Mr. Gates attempted to run away from Officer Ricks almost immediately after Officer Ricks commenced the interaction by asking a single question. Thus, Mr. Gates's reaction and conduct did not permit Officer Ricks a reasonable opportunity to advise Mr. Gates he was free to leave. As to the second consideration, we acknowledge that a patrol car pulling up alongside an individual "could be somewhat intimidating." *Chesternut*, 486 U.S. at 575. But this alone is not sufficient to support the finding of a seizure. And, in this case, the district court found that Officer Ricks approached Mr. Gates in a non-aggressive manner, a finding that is not clearly erroneous. In fact, Officer Ricks's decision not to activate his emergency lights when he approached Mr. Gates supports the district court's factual conclusion.[5] Further, Officer Ricks made contact with Mr. Gates shortly after he observed

---

[5] Officer Ricks activated only his non-emergency spotlight, the activation of which enhances officer safety and does not transform an interaction into a seizure. *United States v. Tafuna*, 5 F.4th 1197, 1201 (10th Cir. 2021).

Mr. Gates run across 37th Street and, therefore, did not follow Mr. Gates for an extended period of time. The compressed timeframe of events in this case decreases the intimidating nature of Officer Ricks's interaction with Mr. Gates. *See United States v. Morgan*, 936 F.2d 1561, 1567 (10th Cir. 1991) (noting that officer followed suspect for "*several blocks* with his red lights on" when assessing whether a seizure occurred (emphasis added)).

Because a significant majority of the factors favor the conclusion that Mr. Gates was not seized at the inception of the interaction and the factors relied upon by Mr. Gates are of minimal value when considered in the context of the interaction, we conclude Mr. Gates was not seized at the outset of the interaction. Therefore, the starting point for our analysis regarding whether reasonable suspicion supported the seizure of Mr. Gates is that Mr. Gates was seized when Officer Ricks ordered him to "come here" and drew and deployed his taser.[6]

---

[6] Our case law holds that "[w]hen an officer does not apply physical force to restrain a suspect, a Fourth Amendment seizure occurs only if (a) the officer shows his authority; and (b) the citizen 'submit[s] to the assertion of authority.'" *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010) (alteration in original) (quoting *California v. Hodari D*, 499 U.S. 621, 625–26 (1991)); *cf. Torres v. Madrid*, 141 S. Ct. 989, 1001 ("Unlike a seizure by force, a seizure by acquisition of control involves either voluntary submission to a show of authority or the termination of freedom of movement." (emphasis added)). Under this articulation of a seizure, Mr. Gates was not seized until Officer Ricks's deployment of the taser impeded his movement. However, where no aspect of the reasonable suspicion calculus upon which we rely occurred between Officer Ricks ordering Mr. Gates to "come here" and Officer Ricks deploying his taser, we need not determine the exact second at which Officer Ricks seized Mr. Gates.

### C.    *Whether Reasonable Suspicion Supported the Seizure of Mr. Gates?*

Similar to our analysis of when Mr. Gates was seized, we start our reasonable-suspicion analysis by outlining the law governing the issue. Then we apply the law to conclude that Officer Ricks had reasonable suspicion to stop Mr. Gates when he ordered Mr. Gates to "come here" and drew and deployed his taser.

### 1.    Governing Law

In assessing whether an officer had reasonable suspicion, this court "must look at the totality of the circumstances of [the] case." *United States v. Kitchell*, 653 F.3d 1206, 1218 (10th Cir. 2011). "For reasonable suspicion to exist, an officer must 'articulate something more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Moore*, 795 F.3d 1224, 1229 (10th Cir. 2015) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Stated as an affirmative standard, to conduct an investigatory stop, "an officer must have a particularized and objective basis for suspecting an individual may be involved in criminal activity." *United States v. Martinez*, 910 F.3d 1309, 1313 (10th Cir. 2018) (internal quotation marks omitted). "Although the government bears the burden of proving the reasonableness of an officer's suspicion, reasonable suspicion is not, and is not meant to be, an onerous standard." *Kitchell*, 653 F.3d at 1219 (internal quotation marks and citation omitted). "In deciding whether the government has met its burden of showing reasonable suspicion, we judge the officer's conduct in light of common sense and ordinary human experience and we accord deference to an officer's ability to

13

distinguish between innocent and suspicious actions." *United States v. Simpson*, 609 F.3d 1140, 1146 (10th Cir. 2010) (internal quotation marks and citations omitted); *see also United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015) ("We defer to all reasonable inferences made by law enforcement officers in light of their knowledge and professional experience distinguishing between innocent and suspicious actions.").

The "particularized and objective basis" threshold does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Kitchell*, 653 F.3d at 1218–19. "To satisfy the reasonable suspicion standard, an officer need not rule out the possibility of innocent conduct, or even have evidence suggesting a fair probability of criminal activity." *Pettit*, 785 F.3d at 1374, 1379 (quotation marks omitted). "As long as an officer has a particularized and objective basis for suspecting an individual may be involved in criminal activity, he may initiate an investigatory detention even if it is more likely than not that the individual is *not* involved in any illegality." *Id.* at 1379–80 (emphasis in original) (internal quotation marks omitted).

## 2.    Application

We conclude Officer Ricks had reasonable suspicion to seize Mr. Gates when he ordered him to "come here" and drew and deployed his taser. Most notably, Mr. Gates's presence at the carwash near the coin machine, without any item in sight to wash, and at 11:00 p.m. on a cold March night with snow on the ground would draw the attention and suspicion of any reasonable officer. Officer Ricks's suspicions

14

were justifiably heightened by Mr. Gates's response to Officer Ricks driving down 37th Street past the carwash.[7] From Officer Ricks's perspective, Mr. Gates engaged in a series of evasive moves—first moving behind the retaining wall as Officer Ricks approached and then scaling the wall and running across the middle of 37th Street upon Officer Ricks passing the carwash. These evasive actions, coupled with the time of day and Mr. Gates's seemingly out-of-place presence at the carwash, were likely sufficient to establish reasonable suspicion and permit Officer Ricks to seize Mr. Gates and inquire about his presence at the carwash. *See United States v. De La Cruz*, 703 F.3d 1193, 1198 (10th Cir. 2013) ("Flight can create reasonable suspicion that the person fleeing is involved in criminal activity." (emphasis omitted)).

Any doubt though regarding whether Officer Ricks held reasonable suspicion when he ordered Mr. Gates to "come here" is resolved by Officer Ricks's observation of a bulge on Mr. Gates's waistline. "[I]n the circumstances facing the officer[] in this case, the presence of a concealed weapon would heighten reasonable suspicion that criminal activity was afoot." *United States v. Briggs*, 720 F.3d 1281, 1288-89 (10th Cir. 2013); *cf. United States v. Gurule*, 935 F.3d 878, 886 (10th Cir. 2019) ("As the Supreme Court [has] observed . . . , a visible and suspicious 'bulge' [on a

---

[7] Mr. Gates contends that it would have been difficult for him, at night, to observe that Officer Ricks was driving a marked patrol car. Although we watched the body camera video and were not able to clearly make out the word "police" on the side of the patrol car, the overhead lights on Officer Ricks's patrol car were quite visible. Therefore, to the extent the district court concluded a person in Mr. Gates's position would have recognized Officer Ricks's vehicle as a police car, the court did not clearly err.

suspect] may alone 'permit the officer to conclude that the suspect was armed and thus posed a serious and present danger to the safety of the officer.'" (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 112 (1977))). Therefore, based on the totality of the circumstances, we conclude Officer Ricks had reasonable suspicion to seize Mr. Gates when he ordered Mr. Gates to "come here" and drew and deployed his taser.[8]

### III.  CONCLUSION

We conclude Mr. Gates was not seized until Officer Ricks ordered Mr. Gates to "come here" and drew and deployed his taser, and Officer Ricks had reasonable suspicion to seize Mr. Gates at that juncture. Therefore, we AFFIRM the district court's denial of Mr. Gates's motion to suppress and AFFIRM Mr. Gates's conviction.

Entered for the Court

Carolyn B. McHugh
Circuit Judge

---

[8] Because of the time of day, Mr. Gates's unexplained presence at the carwash near the coin machine, his flight from the carwash, and the bulge on his waistline are sufficient to establish reasonable suspicion, we find it unnecessary to rely upon the purported high-crime nature of the area around 37th Street and Riverdale Road in reaching our conclusion. We likewise find it unnecessary to consider Mr. Gates's attempt to run away from Officer Ricks after Officer Ricks asked his initial question.