**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 22, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

JAMES THOMAS VANCE,

        Defendant - Appellant.

No. 17-2008

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**(D.C. NO. 1:15-CR-03553-JB-1)**

---

Marc H. Robert, Federal Public Defender, Albuquerque, New Mexico, for Appellant.

C. Paige Messec, Assistant United States Attorney (James D. Tierney, Acting United States Attorney, with her on the brief), Albuquerque, New Mexico, for Appellee.

---

Before **PHILLIPS**, **KELLY**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

# I. INTRODUCTION

During a traffic stop, an officer found a large quantity of drugs in a vehicle driven by James Vance. A grand jury indicted Vance for possession of at least 500 grams of methamphetamine with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). Vance filed a motion to suppress the methamphetamine as the fruit of an illegal traffic stop; the district court denied Vance's suppression motion. Vance entered into a conditional guilty plea, preserving the right to appeal the district court's denial of the suppression motion. *See* Fed. R. Crim. P. 11(a)(2). On appeal, Vance asserts: (1) his conduct did not amount to a violation of N.M. Stat. Ann. § 66-7-317(A) because his lane change did not pose a safety risk to, or have an actual affect on, nearby traffic; and (2) even assuming a lane change that does not pose a hazard to another vehicle can amount to a violation of § 66-7-317(A), officers lacked reasonable suspicion to believe he failed to confirm the safety of his lane change before making it. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms** the order denying Vance's motion to suppress.

# II. BACKGROUND

## A. Factual Background

On September 18, 2015, Vance was driving a car on Interstate 40 near mile marker 145. This stretch of highway covers a long hill; it has three lanes to allow drivers to pass trucks without impeding traffic. As Vance reached the top of the

-2-

hill, he was traveling in the center lane at the posted speed limit.[1] Using his turn signal, Vance moved into the left lane to pass a vehicle in the center lane. He then used his turn signal and "darted" from the left lane to the right lane, without pausing in the center lane. The district court found Vance could not have determined whether his lane change could be made with safety because the vehicle he passed blocked his view. Nevertheless, that car did not have to brake and the lane Vance entered was unoccupied.

Detective Rael of the Bernalillo County Sheriff's Department was on the highway in a marked vehicle at the relevant time. He decided the lane change violated N.M. Stat. Ann. § 66-7-317(A)[2] and pulled Vance over. Rael's report cited Vance's failure to stop between two lanes as the reason for the traffic citation. Rael issued a warning citation for the improper lane change and asked Vance for permission to continue to speak with him. When he noticed the smell of marijuana emanating from the vehicle, Rael obtained consent to conduct a search. Rael found methamphetamine in the trunk and in the driver's side door.

[1]The district court was presented with two starkly different versions of the events preceding the traffic stop that led to the discovery of methamphetamine in Vance's car. The district court specifically found that the account of the events presented by the government at the hearing on the suppression motion was "more credible" and was "internally consistent."

[2]Section 66-7-317(A) reads, in relevant part, as follows: "Whenever any roadway has been divided into two or more clearly marked lanes for traffic . . . a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety . . . ."

Thereafter, a federal grand jury indicted Vance for possession with intent to distribute at least 500 grams of methamphetamine.

## B.  Procedural Background

Following his indictment, Vance filed a motion to suppress.  He argued the stop of his vehicle was not valid because the conduct observed by Rael (i.e., Vance's failure to establish himself in the center lane while moving from the left to the right lane) did not amount to a violation of § 66-7-317(A).  In response, the government did not contest Vance's assertion that failure to establish a vehicle in a center lane while moving from the left to the right lane does not amount to a violation of § 66-7-317(A).  Instead, it claimed Rael's conclusion that Vance's conduct violated § 66-7-317(A) amounted to a reasonable mistake of law.  The government asserted the traffic stop was, therefore, valid under the rule set out in *Heien v. North Carolina*, 135 S. Ct. 530, 536 (2014) ("The question here is whether reasonable suspicion can rest on a mistaken understanding of the scope of a legal prohibition.  We hold that it can.").  In reply, Vance agreed that the analysis of an officer's mistaken interpretation of law was governed by *Heien*.  He argued, however, that § 66-7-317(A) unambiguously authorizes a lane change "so long as it's done safely . . . and there is no evidence that [his] lane change was done unsafely."  For that reason, he asserted Rael's legal mistake was not objectively reasonable.

The district court held a hearing on Vance's suppression motion. During his opening remarks, Vance asserted the parties did not dispute the facts and claimed the sole issue before the court was whether Rael's mistaken interpretation of § 66-7-317(A)—that it precluded a move from the left lane to the right lane without a stop in the center lane—was objectively reasonable. As to that issue, Vance (1) claimed analysis of the reasonableness of a mistake of law is appropriate only if the criminal statute at issue is ambiguous, and (2) maintained § 66-7-317(A) is clear and unambiguous. That is, he asserted the statute requires only that the driver ascertain the safety of any move from one lane to another. Vance further asserted there was no evidence suggesting his particular lane changes were made in an unsafe manner. In its opening remarks, the government backed away from its previous concession that Vance's conduct did not amount to a violation of § 66-7-317(A). It explained that after talking with Rael the day before, its position was that Rael based the stop on Vance's failure to ascertain that his lane change was safe, not on a belief the law always requires a pause in the center lane. That is, the government argued the presence of a car in the middle lane prevented Vance from ascertaining whether there was a car in the right lane before he moved into that lane. For that reason, the government believed the evidence would not, in fact, show any mistake of law.[3] Thus, under

_____

[3]In so arguing, the government recognized its argument differed from that set out in its response to Vance's motion to suppress. It also said it had hoped to

(continued...)

-5-

the government's view, *Heien* would only become relevant if the district court concluded Rael had not, in fact, witnessed a traffic violation.

The government then called Rael to the stand. He testified that on the morning of the traffic stop he was driving on Interstate 40 near mile marker 140. The road was "relatively busy," because it was a weekday and people were commuting into Albuquerque. There are two large hills in the area, which cause many trucks to slow down. This stretch of highway has three lanes of traffic, with the left lane dedicated to passing. Rael saw Vance's vehicle traveling in the center lane. Vance was traveling at or slightly over the speed limit of seventy-five miles per hour. Vance engaged his turn signal and passed a vehicle by moving from the center lane to the left lane. Vance then signaled again, after which he "darted" from the left lane, through the center lane, and into the right lane. "The problem with this," Rael explained, "is as he's passing the other vehicle, he can never establish a safe travel into the [right] lane." From Vance's position in the left lane, he could not see clear to the right lane because of the vehicle he passed in the center. According to Rael, "[w]hether [Vance] looked in his rearview mirror or side-view mirror, we know when you drive there are dead

---

[3](...continued)
have Rael appear before the hearing to give Vance's counsel a chance to speak with him. The government indicated, however, that Rael's work responsibilities prevented an early arrival at the courthouse. Notably, Vance did not object to the government's change of theory, or to the presentation of Rael's testimony at the suppression hearing, and did not seek a continuance to interview Rael prior to his testimony.

spots within the vehicle, and you have to establish that it's safe before you make your turn and/or change of lane." Although the car Vance passed did not have to brake when Vance crossed in front of it, there were several trucks on the roadway at the time of the lane change. Thus, when Rael initiated the stop, he had to slow down and let other traffic pass him before pulling off to the shoulder.

Vance pressed Rael as to whether Vance could have ascertained the safety of his actions by looking in the rearview mirror before initiating the lane change, asking whether "if he did that, that would be fine, would it not?" Rael responded, "No, it would not." Rael testified he stopped Vance and cited him for not being able to make the change safely, because Rael "knew [Vance] couldn't see around a different car." At the conclusion of Vance's cross-examination of Rael, the district court asked Rael whether he stopped Vance "because he made an unsafe lane change" or "because he didn't pause in the lane when he made his change?" Rael testified he stopped Vance for an unsafe lane change. Rael explained that in writing the citation, he "just defined what [Vance] didn't do, if that makes sense."

In closing, the government clarified it was "not asserting that it's necessary to establish a lane before going on to a subsequent lane" but, rather, that in this particular case the presence of the white car in the center lane made Vance's lane change unsafe. Because the stop was valid pursuant to the explicit terms of § 66-7-317(A), the government argued the district court would need to perform an analysis pursuant to *Heien* only if the district court found that Rael had

misinterpreted the law (in some way not specified by Vance at the evidentiary hearing). In his closing, Vance argued Rael did not have reasonable suspicion for the stop because it was "purely speculative from the detective's standpoint as to what [Vance] had seen or done before he made those lane changes." He asserted the right lane was "open the entire time" and there was no violation because "there were no other cars coming."[4]

Three months after the conclusion of the evidentiary hearing, the district court issued an order denying Vance's suppression motion. The district court found, based on Rael's testimony, that "Vance could not have adequately determined whether his lane change could be made with safety, because a white passenger vehicle blocked his view." Vance's failure to "ensure that the right lane was unoccupied" constituted a violation of § 66-7-317(A)'s requirement that a driver ascertain the safety of any movement before moving from the lane. "That Vance used his signal and drove at the speed limit does not render his lane change safe," noted the court, "as many drivers involved in side-swiping collisions can attest." Because Rael made no mistake regarding the applicable law, the district

_____

[4]Rael did testify that Vance did not "interfere[] with" or "cut off" any vehicle in the right lane. Notably, however, he did not testify the right lane was open for any particular distance, no other cars were coming, or no other car on the road could have moved into the right lane in the time it took Vance to pass the white car and initiate his lane change. Instead, as noted above, Rael testified the highway was "relatively busy" because of the morning commute and that there were several trucks on the roadway at the time of the stop.

court concluded the parties' initial dispute over the applicability of *Heien* was "irrelevant."

## III.  ANALYSIS

### A.  Section 66-7-317(A) and Actual Disruption

As the first issue set out in his appellate brief, Vance asserts that even assuming he could not see whether there was oncoming traffic in the right lane before he entered it, he did not violate § 66-7-317(A) because his lane change did not pose a safety risk to, or have an actual affect on, nearby traffic.  Vance is not entitled to relief on this claim of error.  His assertion that § 66-7-317(A) requires an actual disruption of traffic is waived.  Furthermore, even assuming this court could disregard the waiver, Vance cannot show the district court committed plain error in failing to read an element of actual disruption into § 66-7-317(A).

As specifically noted by the government, Vance failed to raise this argument before the district court.  He did not raise it in his motion to suppress, in his reply brief in support thereof, or in his arguments during the suppression hearing.  Nor did he file a motion after the suppression hearing asking the district court to take up the issue or file a motion for reconsideration after the district court issued an order denying suppression.  Rule 12(b)(3)(C) of the Federal Rules of Criminal Procedure requires that a party raise a motion to suppress before trial. A party who fails to do so is only entitled to a review of the claim upon a showing of "good cause."  Fed. R. Crim. P. 12(c)(3).  Failure to comply with the

timeliness requirement set out in Rule 12 constitutes a waiver. *United States v. Burke*, 633 F.3d 984, passim (10th Cir. 2011).[5]  This waiver rule applies not only

---

[5]This court is aware that at the time *United States v. Burke* was decided, Rule 12 used the term "waiver" in describing the consequences of a failure to file a timely suppression motion and that the current version of Rule 12, adopted in 2014, omits the term.  As *Burke* made clear, however, the determination that a failure to timely file a suppression motion amounted to a waiver was not based exclusively on the inclusion of the term "wavier" in Rule 12.  633 F.3d at 989-90. Instead, it was supported by "a number of policy reasons for requiring defendants to move to suppress evidence prior to trial and for deeming their failure to do so a waiver."  *Id.* at 989 (quotation omitted).  Furthermore, the Advisory Committee notes accompanying the 2014 amendments to Rule 12 make clear that the intent of the drafters in removing the term was not to render failures to file timely suppression motions invariably subject to plain error review.  Instead, the purpose was to make clear that a finding of intent on the part of the defendant was not a necessary predicate to Rule 12's application:

> New Paragraph (c)(3) governs the review of untimely claims, previously addressed in Rule 12(e).  Rule 12(e) provided that a party "waives" a defense not raised within the time set under Rule 12(c). Although the term waiver in the context of a criminal case ordinarily refers to the intentional relinquishment of a known right, Rule 12(e) has never required any determination that a party who failed to make a timely motion intended to relinquish a defense, objection, or request that was not raised in a timely fashion.  Accordingly, to avoid possible confusion the Committee decided not to employ the term "waiver" in new paragraph (c)(3).

Given the Committee notes, this court has indicated, albeit in unpublished dispositions, that *Burke*'s reasoning survives the 2014 amendments to Rule 12. *See, e.g.*, *United States v. Shrader*, 665 F. App'x 642, 648-49 & n.6 (10th Cir. 2016); *United States v. Franco*, 632 F. App'x 961, 963-64 & 963 n.1 (10th Cir. 2015).  Although two circuits have reached the opposite conclusion, *United States v. Soto*, 794 F.3d 635, 648-52, 655 (6th Cir. 2015), and *United States v. Sperrazza*, 804 F.3d 1113, 1119 (11th Cir. 2015), Vance has not argued that the 2014 amendments to Rule 12 render *Burke* no longer good law.  Absent any argument at all on the part of Vance about the continued validity of *Burke*, this panel remains bound by that decision.  Thus, the waiver rule set out in *Burke* and

(continued...)

when a defendant fails to file a pretrial motion to suppress, but also when a defendant fails to assert a particular argument in a pretrial suppression motion. *United States v. Gambino–Zavala*, 539 F.3d 1221, 1227 n.2 (10th Cir. 2008). To avoid waiving a particular argument, the party must make "sufficiently definite, specific, detailed and nonconjectural factual allegations supporting his suppression claim" in his pretrial motion. *Id.* (quotation omitted).

As noted above, Vance failed to make the argument he advances on appeal at any point in the district court proceedings. He has also failed to demonstrate good cause that might excuse this failure. Although he faults the government for altering its position at the suppression hearing and upsetting the parties' expectations, this assertion does not come close to demonstrating good cause. Vance never objected at the suppression hearing, asked for a continuance, or filed a supplemental suppression motion in the three months between the conclusion of the suppression hearing and the issuance of the district court's order denying suppression. Nor, thereafter, did Vance file a motion for reconsideration. *See United States v. Randall*, 666 F.3d 1238, 1241 (10th Cir. 2011) (recognizing that the Supreme Court has indicated motions for reconsideration are proper in criminal proceedings, even though not specifically authorized by the Federal Rules of Criminal Procedure). Vance has simply not advanced a good reason why

---

[5](...continued)
Rule 12(c)(3) controls the resolution of this issue.

he should be excused from the consequences of his failure to raise before the district court the issue he asks this court to address on appeal. Because Vance waived the argument, and because he has failed to demonstrate good cause, this court declines to review this argument on appeal.

Even were this court to assume Vance's failure to raise the issue below does not amount to a waiver, he is still not entitled to relief on appeal because he cannot show a plain error on the part of the district court. Indeed, he cannot show error. Relying on New Mexico state court decisions, Vance argues it would be unreasonable for any officer in Rael's position to believe a lane change that did not actually result in a safety risk to surrounding traffic amounted to a violation of § 66-7-317(A). Having reviewed the pertinent authorities, this court concludes Vance's assertions in this regard are, at best, subject to significant debate. Whether Vance is correct about the substance of New Mexico law is not, however, dispositive. Vance can demonstrate the district court erred and he is entitled to suppression only if it was unreasonable for Rael to believe that a violation of § 66-7-317(A) could be based on a driver's failure to ascertain the safety of a lane change. *See Heien*, 135 S. Ct. at 534 (holding that a reasonable mistake of law can "give rise to the reasonable suspicion necessary to uphold [a] seizure under the Fourth Amendment"); *see also United States v. Cunningham*, 630 F. App'x 873, 876 (10th Cir. 2015) (unpublished disposition) (holding, under

the rule set out in *Heien*, that this court need not resolve the state law question, only whether the officer's interpretation was reasonable).

To answer the question required by *Heien*, this court looks to the text of § 66-7-317(A) and to any controlling interpretation given to it by the New Mexico state courts. Looking first to § 66-7-317(A)'s text, we see nothing which would indicate the statute contains an unstated actual-disruption element. Section 66-7-317(A) provides that "a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety." The "first ascertained" language appears entirely incompatible with an approach that evaluates the safety of the movement after-the-fact. The government argues convincingly that driving behavior is unsafe when it increases the risk of an accident, not only when it causes an accident. That is, requiring drivers to first ascertain the safety of a movement focuses on the moment in which harm from a blind lane change can still be avoided.[6]

---

[6]Although the appropriate focus is on whether it was reasonable for Rael to view § 66-7-317(A) as not requiring actual disruption to traffic, rather than on the absolute meaning of the statute, it is worth noting that Vance's interpretation seems to be at odds with other New Mexico traffic laws. His reading would appear to render § 66-7-317(A) superfluous to the careless-driving statute, N.M. Stat. Ann. § 66-8-114, which prohibits a person from operating a vehicle in a careless manner, without "due regard for . . . attendant circumstances"). It would also appear to ignore textual differences between § 66-7-317(A) and N.M. Stat. Ann. § 66-7-325, which governs turn signals. Under § 66-7-325, a turn signal is required only "in the event any other traffic may be affected by such movement."

(continued...)

Furthermore, contrary to Vance's contentions on appeal, no New Mexico state published appellate decision has held that a driver who fails to first ascertain the safety of a lane change has not violated § 66-7-317(A) unless that movement puts another vehicle in danger.[7] Vance cites four published state opinions: *Aragon v. Speelman*, 491 P.2d 173 (N.M. Ct. App. 1971); *Archibeque v. Homrich*, 543 P.2d 820 (N.M. 1975); *State v. Siqueiros-Valenzuela*, 404 P.3d 782 (N.M. Ct. App. 2017); and *State v. Salas*, 321 P.3d 965 (N.M. Ct. App. 2014). This court has closely examined each of these cases and concludes they are so far removed from the facts and circumstances of this case as to provide no real guidance to an officer in Rael's position. *Aragon*, a wrongful death case involving a collision between a vehicle and a bicycle, deals with the propriety of an instruction on negligence per se. 491 P.2d at 175. *Aragon* concluded such an instruction raised a false issue because there was "no evidence that defendant-driver could not safely change lanes when she did." *Id.* at 176. Thus, *Aragon* did not present the

---

[6](...continued)
This language in § 66-7-325 seems to indicate that the New Mexico legislature knows how to include an effect on other traffic as an element of the offense when it wishes to do so.

[7]Vance relies heavily on two unpublished decisions of the New Mexico Court of Appeals. Unpublished decisions are not, however, precedential in New Mexico. Instead, they are "written solely for the benefit of the parties to the action." *Eastland Fin. Servs. v. Mendoza*, 43 P.3d 375, 380 (N.M. Ct. App. 2002). If this court were tasked with definitively divining the meaning of § 66-7-317(A), reference to these unpublished decision might be helpful. Vance has not cited to any authority, however, indicating unpublished, nonprecedential decisions can bear on the reasonableness of Rael's interpretation of § 66-7-317(A).

question whether a driver making an ultimately safe lane change without first ascertaining its safety has violated the statute. *Archibeque* is also a wrongful death case. 543 P.2d at 821. The evidence suggested the defendant fell asleep at the wheel and drifted across the center line of the highway before veering right and running off the road, killing himself and a passenger. *Id.* at 821-22. *Archibeque* concluded only that a negligence-per-se instruction was not called for because the harm or injury to the plaintiff was not of the type the legislature through the statute sought to prevent. *Id.* at 825. *Siqueiros-Valenzuela*, 404 P.3d at 782, was decided well after the events at issue here and, thus, simply does not bear on the reasonableness of Rael's reading of the relevant statute.

The decision in *Salas* is worth a closer look. In contrast to Vance's suggestions, *Salas* actually supports the reasonableness of Rael's interpretation of § 66-7-317(A). Salas argued, as Vance does now, that officers did not have reasonable suspicion to stop him for violating § 66-7-317(A) "because no hazard or peril was created by his actions." *Salas,* 321 P.3d at 968 (quotation omitted). The court rejected this argument. In so doing, *Salas* recognized "there may not have been other traffic at the particular instance of Defendant's erratic driving" and the officers' patrol car "was traveling southbound some distance behind" Salas. *Id.* at 969. Despite these facts, one of the officers "identified himself as other traffic on the roadway that was affected by the movements of [Salas's]

vehicle." *Id.* Ultimately, without regard to the officer's suggestions he might be

affected by Salas's erratic driving, *Salas* concluded the stop was proper because

> Nothing in the record indicates *that Defendant ascertained that his movements could be made with safety*, that he was conscious of or focused on safety or risk, or that his condition was such that he would not continue to drive erratically. A reasonable inference could be drawn that Defendant drove in a manner that would indicate that he was not concerned about possible vehicular travel coming from behind or northbound. The officers had legitimate and reasonable suspicion that lane and illegal turn-related traffic offenses occurred. . . . We hold that under the totality of circumstances, after observing his erratic driving, the officers lawfully stopped Defendant based on the traffic offenses they observed . . . .
>
> Defendant's attempt to negate reasonable suspicion by arguing that the officers acted under a mistake of law in regard to the traffic offenses for which he was stopped is of no avail. First, this argument ignores that Officer Gonzales stopped Defendant for reasons in addition to drifting over lane markers. The officer believed that Defendant may have been impaired. And the officer had concerns about Defendant's illegal turn. Second, we see no mistake of fact or law. It is reasonably likely that had Defendant been cited for violating both lane-change and turn-related traffic offenses, he could have been convicted of the offenses. Third, any mistake could only have been one of fact, not law. *Any possible mistake was only as to whether Defendant "first ascertained" whether his drifting and then turning could be made safely. Under the totality of circumstances here, this would not amount to a mistake of law. Mistakes of fact such as this do not negate reasonable suspicion.*

*Id.* at 969-70 (citations omitted and emphasis added). As the emphasized

passages make clear, what was important to *Salas*'s conclusion that probable

cause existed to support a traffic stop based on a violation of § 66-7-317(A) was

that a reasonable officer could believe Salas failed to ascertain whether his

movements could be made with safety, not whether his movements caused a

disruption to surrounding traffic. Thus, *Salas* offers no support to Vance's contention that only actual disruption of traffic will support a violation of the relevant statute.

The language of § 66-7-317(A) supports the conclusion that actual disruption is not an element of the offense. The extant New Mexico case law does not call that conclusion into question. Indeed, the decision in *Salas* strongly supports that conclusion. Thus, under the Supreme Court's analysis in *Heien*, the district court did not plainly err in concluding Rael's traffic stop of Vance was supported by probable cause.

## B. Failure to Ascertain Safety of Lane Change

Vance asserts the district court erred in concluding Rael had reasonable suspicion he failed to ascertain whether it was safe to move from the left lane, through the center lane, into the right lane. In particular, Vance asserts Rael's "assumption" that he failed to so ascertain is not supported by the facts. Vance's appellate arguments in this regard, which appear to be based on a view of the facts considered most favorable to him,[8] are not convincing.

---

[8]The entirety of Vance's substantive briefing of the issue, which is notable for its lack of record citations, reads as follows:

> Given that there was no evidence of traffic near Mr. Vance other than the white car, Mr. Vance could easily have ascertained the safety of his lane change by checking the lanes behind him and to his right as he passed the white car. This would have been easy to do as Mr. Vance ascended a long steep hill. Having ascertained that there was
>
> (continued...)

When reviewing the denial of a motion to suppress based on an alleged

violation of the Fourth Amendment, this court

> considers the totality of the circumstances and views the evidence in a light most favorable to the government. We accept the district court's factual findings unless those findings are clearly erroneous. The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court. . . . [T]he ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable de novo.

*United States v. Cooper*, 654 F.3d 1104, 1123-24 (10th Cir. 2011) (quotation and

alterations omitted). "A traffic stop for a suspected violation of law is a 'seizure'

of the occupants of the vehicle and therefore must be conducted in accordance

with the Fourth Amendment." *Heien*, 135 S. Ct. at 536. To justify a traffic stop,

an officer needs "only reasonable suspicion—that is, a particularized and

objective basis for suspecting the particular person stopped of breaking the law."

---

[8](...continued)
no traffic moving in his direction for a considerable distance, Mr. Vance could have reasonably determined that it was safe to move into the right lane without pausing to check again from the middle lane. Even if Detective Rael reasonably assumed that Mr. Vance could not have checked his blind spot before moving from the center to the left lane, he could not have discerned whether Mr. Vance determined, prior to passing the white car, that no other vehicles were in the vicinity.

When there is no nearby traffic that would be affected by a lane change, drivers may be able to ascertain that it will be safe to change lanes well before they actually do so. Under those circumstances, officers will often be unable to determine whether or not the driver has ascertained the safety of a lane change and should not be able to initiate a stop based on speculation.

-18-

*Id.* (quotations omitted). "[T]he government bears the burden of proving the reasonableness of the officer's suspicion." *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017).[9]

Vance argues what Rael observed does not give rise to reasonable suspicion that he failed to ascertain the safety of the lane change in question. Vance asserts he "could easily have ascertained the safety of his lane change by checking the lanes behind him and to his right as he passed the white car." *See supra* n.8. The only record evidence on this point, however, is Rael's testimony that Vance could not adequately check the right lane from his position because Vance "couldn't see around a different car." As for Vance's suggestion that he could have surveyed the situation before leaving the center lane and determined there was no traffic moving in his direction for "a considerable distance," *see supra* n.8, this unsupported supposition is entirely inconsistent with Rael's testimony that there were "several trucks on the roadway at this time," the highway was "relatively busy" because of the morning commute, and his patrol car was approximately 150

---

[9]Although this court has indicated the government bears the burden of proving the reasonableness of a traffic stop, *Hernandez*, 847 F.3d at 1263, we have also repeatedly held that "the ultimate burden is on the defendant to prove that the challenged seizure was illegal under the Fourth Amendment." *United States v. Long*, 176 F.3d 1304, 1307 (10th ir. 1999); *see also United States v. Cooper*, 654 F.3d 1104, 1123-24 (10th Cir. 2011); *United States v. Cheromiah*, 455 F.3d 1216, 1220 (10th Cir. 2006). It is unnecessary to attempt to reconcile these two competing lines of precedent in this appeal because the government has carried the burden, assuming it has the obligation to do so, of demonstrating the reasonableness of the traffic stop.

meters behind. Given the evidence in the record and the district court's findings, it was not unreasonable for Rael to believe, as a matter of fact, that Vance could not "ascertain" the safety of his lane change before he attempted it.

Even if there was a chance, however, that Vance could have ascertained the safety of his lane change ahead of time, that chance would not defeat reasonable suspicion. Reasonable suspicion does not require an officer to "rule out the possibility of innocent conduct," and "[e]vidence falling considerably short of a preponderance satisfies this standard." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009) (quotation omitted). Rael did not need to know with absolute certainty that Vance could not ascertain the safety of his lane change ahead of time; he just needed a reasonable suspicion Vance had not done so. The district court did not clearly err in finding that Vance "could not have adequately determined whether his lane change could be made with safety, because a . . . passenger vehicle [in the center lane] blocked his view." Therefore, the traffic stop at issue here was valid.

## IV. CONCLUSION

For those reasons set out above, the order of the district court denying Vance's motion to suppress is hereby **AFFIRMED**.

17-2008, *United States v. Vance*

**PHILLIPS**, Circuit Judge, concurring and dissenting

## I.        INTRODUCTION

In this case, we construe a New Mexico criminal statute defining a traffic offense. After that, we decide de novo whether the traffic stop was reasonable under the Fourth Amendment, that is, whether Detective Rael had reasonable suspicion to stop Vance for violating the statute. In doing so, we decide which party carries the burden of proof on this issue. After that, we evaluate whether the evidence from the suppression hearing satisfies that party's burden.

## II.       THE CRIMINAL STATUTE

After stopping Vance's car, Detective Rael issued him a warning citation for violating N.M. Stat. Ann. § 66-7-317(A) (2015). That part of the statute provides as follows:

> Whenever any roadway has been divided into two or more clearly marked lanes for traffic the following rules in addition to all others consistent herewith shall apply:

> A. a vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety[.]

N.M. Stat. Ann. § 66-7-317. The preliminary language poses no problem—all agree that the stop occurred on an uphill stretch of Interstate 40 that has three marked eastbound lanes.

But Vance argues that subsection A doesn't prohibit motorists from darting across multiple lanes of traffic—even motorists who don't bother to look before darting—unless

they actually jeopardize safety. I agree with the majority that this position lacks merit. Maj. op. at 9–17. Quite simply, the statute sensibly requires drivers to ascertain safety before they dart lanes.

Things get strange after that. Though in his traffic report, Detective Rael justified the traffic stop by noting that Vance had crossed lanes "without establishing the No. 2 [middle] lane before proceeding to the No. 3 [right] lane," the government has steadfastly rejected a statutory interpretation requiring Vance to do so. In its written response to the suppression motion, the government argued that Detective Rael's establish-the-middle-lane requirement was legally mistaken, but still objectively reasonable under *Heien v. North Carolina*, 135 S. Ct. 530 (2014).

Then at the suppression hearing, the government changed its argument. It now argued that Vance had indeed violated the statute—by not first ascertaining the safety of his multi-lane movement. In support, it contended, through Detective Rael's testimony, that the white car had obstructed Vance's view of the right lane.

So the upshot is that the government concedes a motorist can dart across multiple lanes after once ascertaining the safety of doing so. Otherwise stated, motorists need not establish their cars in each lane and remain there until again ascertaining the safety of moving into the next adjacent lane. Under the government's reading, the statutory element that "a vehicle shall be driven as nearly as practical within a single lane" either excludes lanes darted across or is met whenever four tires occupy the darted-across lane. I don't necessarily endorse that view, but for purposes of this case, at least, I will take the government's lead, reading the statute as allowing Vance to dart across as many lanes as

2

he pleased, so long as, before crossing the first lane, he ascertained the safety of crossing them all.

## III.    REASONABLE SUSPICION

So we take up right there.  The government has argued that Detective Rael possessed reasonable suspicion that Vance had violated the statute by crossing lanes when the white car obstructed his view of the right lane. *See* maj. op. at 7 (alteration in original) ("Rael testified he stopped Vance and cited him for not being able to make the change safely, because Rael 'knew [Vance] couldn't see around a different car.'"). And as the majority notes, the district court agreed with Detective Rael that "Vance could not have adequately determined whether his lane change could be made with safety, because a white passenger vehicle blocked his view." *Id*. at 8.

The majority correctly notes that we must view the evidence in the light most favorable to the government and accept the district court's fact findings unless clearly erroneous. *Id*. at 18. The majority also correctly places the burden on the government to prove that Detective Rael had reasonable suspicion that Vance had violated § 66-7-317(A).[1] Maj. op. at 19-20. *See, e.g.*, *United States v. Lopez*, 849 F.3d 921, 925 (10th Cir. 2017) (concluding that "[t]he government bears the burden of proving reasonable suspicion" justifying continuing detention in a speeding stop ultimately leading to a methamphetamine seizure); *United States v. Burciaga*, 687 F.3d 1229, 1230 (10th Cir. 2012) ("The Government bore the burden before the district court of establishing by a

---

[1] This leaves me unsure why the majority partly bases its decision on Vance's failing to obtain testimony from Detective Rael about facts important to the government's establishing reasonable suspicion for the traffic stop. *See* maj. op. at 8 n.4.

3

preponderance of the evidence that reasonable suspicion supported the officer's stop of Defendant's vehicle [for failing to timely signal his lane change]."); *United States v. Valenzuela*, 494 F.3d 886, 888 (10th Cir. 2007) (concluding that "[t]he government bears the burden of proving the reasonableness of the officer's suspicion" that a "particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction," here veering across lane markings under a Colorado statute much like the New Mexico statute in Vance's case).

To meet its burden, the government needed to show that Detective Rael had reasonable suspicion that Vance had failed to first ascertain the safety of crossing into the right lane before doing so.[2] That would be easy if Detective Rael had seen Vance's car cause other cars to brake or swerve. But it's not so easy when Detective Rael concedes that Vance passed the white car by a safe margin before crossing the middle lane and that Vance encountered no automobile approaching nearby in the right lane.

I conclude that Detective Rael lacked reasonable, articulable suspicion that Vance violated the statute.[3] What if everything had been the same that day, except that no white

---

[2] Like the majority, I fully credit Detective Rael's statement that Vance "couldn't see around a different car." Maj. op. at 19. Detective Rael testified that Vance had "just" passed the white car—safely. So it makes sense that when Vance began to change lanes, the white car blocked a view the right lane on a direct line from his sight (so cars further back on the road). But that doesn't mean that Vance hadn't already checked the trailing traffic and seen none in play.

[3] "Whether reasonable suspicion exists is an objective inquiry determined by the totality of the circumstances, and 'an officer's subjective motivation for the stop play[s] no role in ordinary [reasonable suspicion] Fourth Amendment analysis.'" *United States v. Salas*, 756 F.3d 1196, 1201 (10th Cir. 2014) (alterations in original) (quoting *United*

4

car was in the middle lane? Detective Rael would have lacked reasonable suspicion that Vance had crossed into the right lane without looking.

The presence of the white car doesn't give a different result. Vance could have ascertained the safety of moving into the right lane *before* passing by the white car to the point where it would have partially obstructed his backward view.[4] In the few seconds from that point until Vance changed lanes, the semi-tractor-trailer trucks plodding uphill wouldn't have gained the speed of Indianapolis 500 race cars, passed the marked patrol car, passed the white car, and occupied a segment of the right lane endangered by Vance's lane crossings. We need to recognize that automobiles in the right lane would have had to make up considerable ground in a few seconds. Obviously, automobiles on highways differ from birds on wires—they can't just pop on and off at a given spot.

And the government offered no evidence to support reasonable suspicion that Vance had failed to ascertain the safety of crossing lanes before the white car obstructed his view. Trooper Rael didn't testify about Vance's head movements in relation to his rear-view mirror (and obviously Detective Rael couldn't see Vance's eye movements). What Detective Rael did see was Vance obeying the traffic laws. What would give Detective Rael reasonable suspicion that a law-abiding driver would dart into a lane he hadn't checked would be empty? Not Detective Rael's general, unstartling testimony that

_____

*States v. Harman*, 742 F.3d 451, 456 (10th Cir. 2014) (internal quotation marks omitted)).

[4] Even *after* Vance passed the white car by a sufficient distance to safely reenter the middle lane, Vance would have seen much more than the white car in his rear-view mirror. And whatever the white car obstructed in the right lane would have trailed the white car, which Vance safely passed.

other automobiles were somewhere on the long uphill stretch of highway when Vance changed lanes, that "several trucks [were] on the roadway at this time," or that the highway was "relatively busy" because of the morning commute (the stop occurred at 10:30 a.m.). Automobiles behind Detective Rael were too far back to matter. And Detective Rael never testified that any automobiles passed him between the time Vance moved to pass the white car and the time Vance crossed into the right lane.

I'm also troubled that this case differs from other reasonable-suspicion cases in an important way. Detective Rael had nothing to investigate after stopping Vance. Nothing about Vance or his car could help establish whether Vance had ascertained the safety of his lane changes. Obviously the rental car had no camera capturing Vance's head and eye movements. So could Detective Rael stop Vance just to question him on this point? I see no cases cited from the government authorizing stops to try to obtain confessions about conceivable crimes—or in hopes of finding evidence of unknown, unrelated crimes, evidence such as the smell of marijuana Detective Rael detected soon after the stop. We shouldn't authorize stops in such circumstances.