**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**January 29, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

LEONARDO RODRIGUEZ-
REYES,

    Defendant-Appellant.

No. 06-2043

(D.C. No. CR-05-1196 RB)
(D. New Mexico)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE, EBEL,** and **TYMKOVICH**, Circuit Judges.

After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. See Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is, therefore, ordered submitted without oral argument.

Defendant Leonardo Rodriguez-Reyes (Rodriguez-Reyes) entered a

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

conditional guilty plea to possession with intent to distribute one hundred kilograms or more of marijuana in violation of 21 U.S.C. § 841(a)(1), 21 U.S.C. § 841(b)(1)(B), and 18 U.S.C. § 2. The only issue presented for review is whether the district court erred in denying Rodriguez-Reyes' motion to suppress physical evidence and statements in ruling that there was reasonable suspicion that Rodriguez-Reyes was involved in criminal activity sufficient to justify an investigatory stop by a roving Border Patrol agent. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

## I. Factual Background

The following facts are based upon the testimony of the two United States Border Patrol Agents, Jose Aguilar (Agent Aguilar) and Jesus Flores (Agent Flores), who testified at the hearing on Rodriguez-Reyes' motion to suppress. These are also essentially the same factual findings made by the district court in its order denying Rodriguez-Reyes' motion to suppress. Rodriguez-Reyes does not contest any of these factual findings as being clearly erroneous and there appears to be no reason to discount the testimony of either officer.

On February 24, 2005, between 7:00 p.m. and 9:00 p.m., Agent Aguilar received information about a sensor alert four miles west of Columbus, New Mexico. The alert indicated that someone, probably in a vehicle, crossed the United States/Mexico border at that location. Agent

Aguilar, who was parked two to three miles east of Columbus when he received the sensor alert information, decided to investigate and he headed west on Highway 9 past Columbus. At its closest point, Highway 9, a two-lane paved road that runs parallel to the United States border with Mexico, is about one mile from the border, and about three to four miles from the border generally. During daylight hours, most of the traffic on Highway 9 is farm and ranch traffic and there are few tourists on this road after dark. The Border Patrol apprehends alien and drug smugglers on Highway 9 almost daily.

Approximately one mile west of Columbus, Agent Aguilar saw headlights from a vehicle approaching him on Highway 9. Based on the timing of the activation of the sensor and his encounter with this vehicle, Agent Aguilar believed that the vehicle likely activated the sensor. He did not encounter any other vehicles coming from the area where the sensor was located. Agent Aguilar pulled to the side of the road and parked at a forty-five-degree angle so that he could get a better look at the vehicle as it drove by. Twenty to thirty seconds later, the vehicle was close enough for Agent Aguilar to identify it as a Jeep Grand Cherokee with Arizona license plates. He also saw that there was fresh, wet mud on the rear of the vehicle.

From this, and given that it had rained intermittently over the previous few days, Agent Aguilar surmised that the mud indicated that the Cherokee

had been driven off-road recently. He also testified that there were numerous unimproved roads coming from the Mexican border to Highway 9, which become very muddy in rainy weather. Within the few days preceding February 24, 2005, the day in question, the Border Patrol had apprehended between five and ten "drive-throughs," that is, individuals driving across the United States/Mexican border at places other than a port of entry. Agent Aguilar also knew that drug and alien smugglers preferred SUV-type vehicles, as they could carry a fair amount of cargo, and also had "off-road" capabilities. The Cherokee's Arizona license plates also indicated that the vehicle was not local and was not part of the usual traffic pattern on Highway 9 at that time of night.

As the Cherokee passed Agent Aguilar, he proceeded to follow it eastbound on Highway 9. Agent Aguilar noticed that the Cherokee was traveling at about forty-five miles per hour, which was ten miles below the posted speed limit. While following the Cherokee, Agent Aguilar contacted the El Paso border sector and asked them to run a "72-hour lane check," that is, to determine whether this particular vehicle had passed through a port of entry within the preceding seventy-two hours, and to check the registration to determine whether the Cherokee had been reported as stolen. Agent Aguilar was told that the Cherokee was registered to a woman who lived in Mesa, Arizona and that it had not crossed the border through a port of entry

within the last seventy-two hours.

When the Cherokee arrived at the intersection of Highway 9 and Highway 11, it stopped and waited somewhat longer than Agent Aguilar would have generally expected. Highway 11 is a two-lane paved highway running north and south from the port of entry in Columbus to Deming, New Mexico. Agent Aguilar could not see into the Cherokee, but could see that it was riding low in the rear, as if it were carrying extra passengers or heavy cargo. Thereafter, the Cherokee turned north on Highway 11. Agent Aguilar continued to follow the Cherokee through Columbus. The Cherokee was now traveling about fifteen miles per hour below the posted speed limit of thirty-five miles per hour. Agent Aguilar testified that this was very unusual, because drivers usually exceed the speed limit and drive forty to forty-five miles per hour on this portion of the highway. He testified further that he suspected that the driver was becoming nervous that he was being followed, although he also testified that he was in an unmarked vehicle.

Agent Aguilar then activated his emergency equipment and stopped the Cherokee on Highway 11. He approached the driver, Rodriguez-Reyes, and asked him his citizenship. Rodriguez-Reyes responded in broken English that he was an American citizen. Agent Aguilar asked him first in English, then in Spanish, whether there was someone else in the vehicle. Rodriguez-Reyes responded affirmatively and gestured towards the back of

the vehicle. Agent Aguilar asked Rodriguez-Reyes in Spanish if he could look in the back of the vehicle and Rodriguez-Reyes consented. Upon opening the rear door of the Cherokee, Agent Aguilar saw bundles consistent with the packaging of marijuana. No one else was in the Cherokee. Agent Aguilar took Rodriguez-Reyes into custody and radioed another Border Patrol Agent, Agent Flores, for assistance.

Agent Aguilar read Rodriguez-Reyes his <u>Miranda</u> rights in Spanish. Rodriguez-Reyes stated that he understood these rights and answered Agent Aguilar's questions. He stated that he had intended to drive the Cherokee to a residential area just west of Highway 11 and leave it in a parking lot. He anticipated receiving $3,000 for his efforts. Law enforcement officers seized approximately 370 pounds of marijuana following their search of the Cherokee.

## II. Analysis

Standards governing our review of a district court's ruling on a motion to suppress are well established. <u>United States v. Cantu</u>, 87 F.3d 1118, 1120 (10th Cir. 1996). We consider the evidence in the light most favorable to the prevailing party, here the government, and accept the district court's factual findings unless clearly erroneous. <u>Id.</u>; <u>United States v. Anderson</u>, 114 F.3d 1059, 1063 (10th Cir. 1997). But, the "ultimate determination of reasonableness under the Fourth Amendment is a question of law reviewable

de novo." United States v. McKissick, 204 F.3d 1282, 1296 (10th Cir. 2000). The defendant bears the burden of establishing that the challenged stop violated the Fourth Amendment. United States v. Long, 176 F.3d 1304, 1307 (10th Cir. 1999).

Rodriguez-Reyes essentially argues that Agent Aguilar violated his Fourth Amendment right to be free from unreasonable search and seizure, because Agent Aguilar only had a "hunch," and not a reasonable suspicion, that Rodriguez-Reyes was smuggling aliens or drugs when he was stopped. Contrary to Rodriguez-Reyes' view of the evidence, Agent Aguilar had reasonable articulable suspicion to stop Rodriguez-Reyes' vehicle.

Consistent with the Fourth Amendment's prohibition against unreasonable searches and seizures, Border Patrol agents on roving patrol are permitted to "stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion" that the occupants are involved in criminal activity. Cantu, 87 F.3d at 1121 (quoting United States v. Brignoni-Ponce, 422 U.S. 873, 884 (1975)). Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." United States v. Arvizu, 534 U.S. 266, 274 (2002). Rather, "reasonable suspicion represents a 'minimum level of objective justification.'" United States v. Mendez, 118 F.3d 1426, 1431

(10th Cir. 1997) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)).

In determining whether there is reasonable suspicion to stop a car in the

border area, officers may consider any number of factors, including:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

United States v. Monsisvais, 907 F.2d 987, 989 (10th Cir. 1990) (citing

Brignoni-Ponce, 422 U.S. at 884-85).

When evaluating an officer's decision to stop a vehicle, a court may

not engage in a "divide-and-conquer analysis" by evaluating and rejecting

each factor in isolation. Arvizu, 534 U.S. at 274; United States v.

Gandara-Salinas, 327 F.3d 1127, 1130 (10th Cir. 2003). This is because

factors that, by themselves, may be "consistent with innocent travel" may

collectively amount to reasonable suspicion. Arvizu, 534 U.S. at 274-75

(quoting Sokolow, 490 U.S. at 9). Rather, "the totality of the circumstances

– the whole picture – must be taken into account. Based upon that whole

picture the detaining officers must have a particularized and objective basis

for suspecting the particular person stopped of criminal activity." United

States v. Cortez, 449 U.S. 411, 417-18 (1981). "In all situations the officer

is entitled to assess the facts in light of his experience in detecting illegal entry and smuggling." Brignoni-Ponce, 422 U.S. at 885.

The district court found that Agent Aguilar was aware of specific articulable facts, which, when taken with rational inferences from these facts, indicated Rodriguez-Reyes' vehicle might have been involved in criminal conduct. In fact, the district court found the majority of the Brignoni-Ponce factors satisfied in this case. Specifically, the district court found that the following facts, taken together and given Agent Aguilar's knowledge of local inhabitants and the vehicles they drove, gave rise to reasonable suspicion to stop Rodriguez-Reyes:

> (1) Rodriguez-Reyes'[Cherokee], because of its location along [Highway] 9, could have caused the sensor alert that triggered shortly beforehand; (2) the [Cherokee] had a significant amount of mud on its fenders and bumper that was indicative, given the recent rain, of a vehicle that had recently traveled along a dirt road; (3) many dirt roads run from the Mexican Border to [Highway] 9 West of Columbus, New Mexico; (4) the vehicle was traveling well below the posted speed limit and appeared to be riding low; (5) the [Cherokee] had Arizona license plates; and (6) non-local traffic is highly unusual along that portion of [Highway] 9, particularly at that time of night.

Pleadings, Vol. 1, Doc. 26, p. 6.

Here, the Brignoni-Ponce factors support the conclusion that Agent Aguilar's stop of the Cherokee was based on a reasonable and articulable suspicion that its occupant was engaging in criminal activity. Agent Aguilar first saw the Cherokee in a remote area within a few miles of the

Mexican border shortly after a sensor indicated that a vehicle illegally entered the United States. The Cherokee was traveling from the area where the sensor had been tripped, and there were no other vehicles in the area. The Cherokee was muddy, suggesting it had recently been off-road, which is consistent with the theory that it had just driven off-road to cross into the United States illegally. Moreover, the Cherokee had out-of-state plates, which Agent Aguilar testified was unusual given that usually traffic at that time of night was almost entirely local.

Bolstering these facts is the additional fact that Agent Aguilar knew that there had been between five and ten illegal vehicles crossing in the same area within the preceding few days and that the Border Patrol apprehended smugglers of both aliens and drugs on an almost daily basis in that area. Moreover, the make of Rodriguez-Reyes' vehicle was consistent with a vehicle well-suited for transporting drugs, because it had ample cargo space and could be driven off-road from the border to Highway 9. Two other factors heavily favor the reasonableness of Agent Aguilar's investigatory stop. First, Rodriguez-Reyes was driving on the roads in question much more slowly than one might generally expect, even though Agent Aguilar was following him in an unmarked car. Second, the rear of the Cherokee appeared heavily loaded, which is clearly a further articulable fact consistent with the theory that Rodriguez-Reyes was transporting some

form of contraband.

Although there may be an innocent explanation for each one of these facts, as Rodriguez-Reyes himself argues, we must consider these facts from the vantage point of a reasonable law enforcement officer. Arvizu, 534 U.S. at 277-78. Moreover, we must defer to Agent Aguilar's ability, as an experienced law enforcement officer, to distinguish between innocent and suspicious acts. See United States v. Williams, 271 F.3d 1262, 1268 (10th Cir. 2001).

Agent Aguilar's experience with the area, when coupled with the facts presented, gave rise to reasonable suspicion to stop Rodriguez-Reyes. Rodriguez-Reyes' car was the first vehicle Agent Aguilar saw after the sensor was tripped, Rodriguez-Reyes had out-of-state plates, but he was driving at a time and place where the only legal traffic is usually local, he was driving very slowly, and, given the fact his vehicle was riding low, it appeared he was transporting contraband. Considering all these facts in light of Agent Aguilar's knowledge and experience, we conclude that the district court did not err in denying the motion to suppress.

AFFIRMED.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

-11-